## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : : : |
| **Plaintiff,** | : |
|  | : **Civil Action No.** |
| **v.** | : |
|  | : |
| **ARCHIE PAUL REYNOLDS a/k/a DR. A. PAUL REYNOLDS, and SUCCESS TRUST DEVELOPMENT PARTNERS LLC,** | : : : : |
| **Defendants.** | : |
|  | : |

U. S. DISTRICT COURT - DE
MISC. CASE # ___0 7 - 1 5 0___

2001 AUG -2 AM 9: 44
CLERK U.S. DISTRICT
DISTRICT OF DELAWARE
FILED U.S. DISTRICT COURT

### NOTICE OF RECEIVERSHIP

COMES NOW Pat Huddleston II, by and through his counsel, Cauthorn & Nohr, P.C., as the Court-appointed Receiver for Success Trust Developmental Partners, L.L.C. and hereby provides notice of his appointment as receiver pursuant to 28 U.S.C. § 754 and files with the Clerk of this Court a copy of the Complaint (attached as "Exhibit A") and the Order Appointing Receiver for Success Trust L.L.C (attached as "Exhibit B").

Respectfully submitted this 1ST day of August 2007.

CAUTHORN & NOHR, P.C.

_Sara L. Nohr_

Jason L. Nohr
Georgia Bar No. 545435

201 Cherokee Street
Marietta, Georgia 30060
(770) 528-0150
(770) 528-0160 – facsimile

ORIGINAL

FILED IN CLERK'S OFFICE
U.S D C   Atlanta

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

AUG 0 2 2006

JAMES N HATTEN, Clerk
By: _JRPockrey_
Deputy Clerk

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : : | |
| Plaintiff, | : | Civil Action No. |
| v. | : : | **06 CV 180:** |
| ARCHIE PAUL REYNOLDS a/k/a DR. A. PAUL REYNOLDS, and SUCCESS TRUST AND HOLDING LLC, | : : : : | RWS |
| Defendants. | : : : | |

## COMPLAINT FOR EMERGENCY INJUNCTIVE AND OTHER RELIEF

Plaintiff, Securities and Exchange Commission ("Commission"), alleges that:

### OVERVIEW

1.     From as early as May 2005 through the present, Archie Paul

Reynolds a/k/a Dr. A. Paul Reynolds ("Reynolds") and an entity that he controls,

Success Trust and Holding LLC ("Success Trust"), have raised millions of dollars

from at least 500 investors by offering and selling fraudulently interests in three

investment programs.



EXHIBIT
A

2. The Success Trust investment scheme is comprised of three separate programs (collectively "the Programs"): the Real Estate Program, the Best Efforts 480% Annual Return Program, and the Private Party Loan Agreement.

3. The largest Program, the Real Estate Program, in which more than $2 million was invested, projected exorbitant returns from investments in vaguely described "banking processes" which do not in fact exist. These processes were often described in vague and confusing terms, which make little or no economic sense. The Success Trust Programs resemble "Prime Bank" frauds, which have been circulating since the 1980's.

4. Reynolds and Success Trust lured investors with offering materials that falsely claim that each Program pays projected rates of return ranging from 10% to 480% per year, and that an investment in the Program is either guaranteed or risk-free. For example, the Real Estate Program required the investor to pay a fee of $3,000 and later $7,500 and provide Success Trust with a power of attorney permitting it to pledge the investor's real estate equity, generally the investor's residence, as collateral for a loan. In exchange, Success Trust represented that it would pay off the investor's mortgage in 36 months, plus make an additional

2

payment at the end of that period. Success Trust claimed that the power of attorney would be used to secure profits from a vaguely-described trading program involving a "world bank." Success Trust represented that the investment was risk free. In fact, a risk free trading process providing the returns suggested by Success Trust does not exist.

## VIOLATIONS

5.    The defendants have engaged, and unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

6.    The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin the defendants from engaging in the transactions, acts, practices, and courses of business alleged in this

3

complaint, and transactions, acts, practices, and courses of business of similar

purport and object, for civil penalties, and for disgorgement of illegally-obtained

funds and other equitable relief.

7.    This Court has jurisdiction over this action pursuant to Sections 20

and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d), 21(e),

and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.    The defendants, directly and indirectly, made use of the mails, the

means and instruments of transportation and communication in interstate

commerce and the means and instrumentalities of interstate commerce in

connection with the transactions, acts, practices, and courses of business alleged in

this complaint.

9.    Certain of the transactions, acts, practices, and courses of business

constituting violations of the Securities Act and Exchange Act occurred in the

Northern District of Georgia. For example, defendants Reynolds and Success

Trust sent or caused to be sent various e-mail communications in furtherance of

the scheme to investors or potential investors who reside in the Northern District

of Georgia, and those residents opened those e-mails and acted on the instructions

4

contained in them while in that district. Additionally, various phone calls took place between Success Trust, on the one hand, and investors in the Northern District of Georgia, on the other, which were important steps in the execution or consummation of the scheme. Additionally, the real property used by at least one investor to participate in the Real Estate Program is located in the Northern District of Georgia.

10.    Defendants Reynolds and Success Trust, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## THE DEFENDANTS

11.    **Archie Paul Reynolds**, age 57, resides in Simpsonville, South Carolina. Reynolds, who calls himself Dr. A. Paul Reynolds in offering materials and communications with investors, represents himself to be the founder, main trustee, sole officer, and Chairman of Success Trust. In May 2006, the Wisconsin Department of Financial institutions issued an order prohibiting Reynolds and Success Trust from offering and selling unregistered securities in that state.

5

12.    **Success Trust and Holding, LLC**, is a Delaware limited liability company formed on April 21, 2005. Its principal place of business is in Simpsonville, South Carolina. Reynolds owns or controls Success Trust. Success Trust acts through Reynolds, through employees, and through its commissioned sales agents, who are called Independent Representatives.

## THE THREE FRAUDULENT "PRIME BANK" SCHEMES

13.    Reynolds and Success Trust have promoted investments in at least three Programs, each of which offers unusually high rates of return and at least one of which is purportedly risk-free.

14.    Reynolds and Success Trust have disseminated false and misleading information about the Programs by means including live presentations by Reynolds, two Internet websites (collectively, the "Website"), a recorded voice message by Reynolds, and numerous Independent Representatives around the United States, as well as various offering documents and Client Agreements tailored to each of the Programs.

6

26.     Success Trust and Reynolds represented that the investors' real estate equity would be placed in a "package," and that Success Trust acted as a "packager/facilitator" in submitting the package to a consortium, which then allegedly put the package into a "world bank platform."

27.     The Website described the "complete deal" for the Real Estate Program as follows: World banks deliver a "100% letter of guarantee" to a United States bank, the United States bank opens a special non-interest-bearing account, and "[a]ll clients [i.e., investors] are attached to that account." The "client/lender" receives a "100% bank letter of guarantee," the world banks "deliver, in minutes, the binding instrument," and the United States bank is "paid in full within minutes 108%" with "no risk whatsoever" to the United States bank. The investors then receive and endorse the "final instrument" and send the documents to an identified location. Funds purportedly are released after a "[p]ackage of no less than 400M is sent to the consortium." Funds "start flowing back to the consortium processing center in 8 to 13 weeks," and then Success Trust "begins calculations for payments and commissions" and "starts sending payments" to investors. The Website further described this process as "an everyday activity at banks all over the world."

9

28.    Success Trust represents that it acts as a packager/facilitator in conjunction with major international banking partners. For example, the Website stated that Success Trust had "representation in 21 other countries," and was affiliated with "[t]he top 15 Financial partners of the world which provide the highest security level available." The Website further stated: "Our contracts are with the top global consortium group of the world and they have in place contracts with over 30 of most [sic] experienced professionals dealing in the private placement industry." Success Trust added that these contracts "have the highest degree of security attached to them," are "highly confidential in nature," and will be cancelled if shown. In addition, Success Trust stated that "it has taken 7 years to get them in place for you, the client," and these "contracts are indeed the holy grail to the financial industry."

29.    Reynolds and Success Trust lead investors to expect unusually high returns from the Real Estate Program.

30.    For investors owning real estate encumbered by a mortgage, Success Trust projects in Client Agreements, on the Website, and in other materials that the Real Estate Program will generate profits sufficient to pay off the investor's entire

10

principal mortgage balance in monthly payments of up to 36 months, plus pay an additional amount after the close of the 36-month period.

31.     Success Trust represented on its Website that it would "pay all future principal payments for 3 years starting with the first payment," that "[t]here is always a possibility we could pay off the mortgage in 1 year but we maintain the 3 year contract," and that any "excess funds" sent to investors "could be a substantial amount but not guaranteed.  It is based on portfolio experience."  The Website added:  "Wow!!  What a deal!! . . . Leverage your equity and pay off that mortgage in 36 months or less without creating another loan to you!"

32.     Previously, Success Trust represented that the additional amount it would pay investors after the close of the 36-month period would be equal to the appraised value of the property.  However, recent Client Agreements indicate that Success Trust will use its "best efforts" to make this final payment.

33.     Reynolds and Success Trust also offer an "Equity Program" as part of the Real Estate Program.  The Equity Program is particularly promoted for investors who own real estate outright (although clients with mortgages can participate as well).

11

34. Through the Website, Client Agreements, and other materials, Reynolds and Success Trust lead investors in the Equity Program to expect high returns for 36 months.

35. The anticipated returns are based on the percentage of the appraised value of the real estate equity that the investors hold free and clear, less certain expenses.

36. The advertised rate of return for a property with no debt (*i.e.,* 100% equity) is 10% per month of the appraised value of the real estate, an annual return of 120%.

37. For example, Success Trust explained in a 2005 presentation that if residential property were appraised at $100,000 and had no mortgage, Success Trust would pay the investor $10,000 per month for 36 months.

38. Success Trust and Reynolds represented that investors in the Equity Program would receive additional profits. One version of the Website and Client Agreement claimed that investors in the Equity Program would receive, in addition to the monthly payments, a final payment in the 40th month equal to the

12

full appraised value of the real estate. Recent Client Agreements describe all of the payments as "best efforts" and based on "portfolio experience."

39.    Success Trust has represented to investors that it will also profit by the use of the investors' equity in the Real Estate Program, although Success Trust does not disclose the amount of its projected profit. The Website previously included a link to an article that stated: "banks have agreed to provide a win-win scenario in which they stand to make millions, and we (you and me) stand to make thousands and possibly millions depending on what particular assets you have available." Success Trust added: "Does Success Trust & Holding LLC stand to make a hefty profit? You bet! Do you stand to make a hefty profit? YOU BET!"

40.    Reynolds and Success Trust have lulled investors into believing that investment was performing as expected by making statements to investors and Independent Representatives indicating that payments will be received in the near future.

41.    For example, a taped telephone message by Reynolds that was available until April 2006 stated, "[w]e had a number of people that will be receiving their return shortly."

13

42.     Likewise, a newsletter from Reynolds distributed electronically in or around May 2006 answered the question "When is the money coming?" as follows: "We are almost there. I have never given you a 'hard' start date because the process has been unpredictable and I've had to exercise caution to protect you and the company."

43.     Similarly, a letter from Reynolds distributed on behalf of Success Trust in June 2006 to investors and Independent Representatives claimed "we are here at the end of the process . . . Many clients' mortgages will be history by years' end, while many others will be history by the end [sic] the year 2007."

44.     Notwithstanding these projections, few Real Estate Program investors have received any returns.

### Best Efforts 480% Annual Return Program

45.     Defendants have also offered interests in a "Best Efforts 480% Annual Return Program."

46.     Pursuant to this Program, Success Trust purportedly facilitates 12-month loans from investors for placement in "Private Lender/Private Programs."

14

47.    Defendants claim that the funds obtained through this Program will remain in Success Trust's bank account until the loan is accepted by an as yet unidentified third party borrower in a transaction arranged by Success Trust.

48.    Defendants tell investors that the loans will pay guaranteed interest of 10% per annum and "best efforts" interest of 40% monthly (*i.e.,* 480% annually).

49.    These returns are to begin six weeks and four days after the passage of a to-be-determined "Cycle Date".

50.    Success Trust represents to investors that the funds they loan through the Best Efforts 480% Annual Return Program will remain in Success Trust's bank account until the loan is accepted, and funds are considered accepted "at such time as they are transferred out and the Transaction [not defined] is initiated."

## Private Party Loan Agreement

51.    Success Trust also offers a "Private Party Loan Agreement". The Private Party Loan Agreement is similar to the Best Efforts 480% Annual Return Program, except that the investor makes a 12-month loan directly to Success Trust, "for project(s) of the Company's choice," defined as "Transactions."

15

52.    Success Trust promises to pay investors in the Private Party Loan Agreement "minimum guaranteed annual interest" of 10%, and also repay the principal at the end of a 12-month term (which begins at an ill-defined "Cycle Date").

53.    In addition to the minimum guaranteed annual interest, at least one Independent Representative has represented that investors in the Private Party Loan Agreement can receive substantial additional returns.

54.    Success Trust represents to investors that funds loaned to it through the Private Party Loan Agreement remain in Success Trust's bank account until the so-called Transactions are initiated, and that this takes place only in blocks of $1,000,000.

## Misrepresentations and Omissions of Material Fact

55.    Reynolds and Success Trust have falsely stated that, in connection with the Real Estate Program, investor funds and/or investor real estate equity would be used in profitable, risk-free transactions involving vaguely described bank processes. In fact, such bank processes offering the exorbitant risk free profits represented by the defendants do not exist.

16

56.     Neither Reynolds nor Success Trust had any reasonable basis for
presenting the Programs as viable commercial transactions or for representing that
investors would receive the exorbitant risk free profits which were projected to
them. At a minimum, the defendants were severely reckless in making such
representations without having any reasonable basis to do so.

57.     Reynolds and Success Trust have falsely claimed that Success Trust
has a relationship with the "top global consortium group of the world" and the
"top 15 Financial partners of the world." In fact, Success Trust does not have such
relationships, beyond possibly ordinary banking transactions.

58.     An earlier version of the Website also included a link to an article
titled "Monetization," which stated that Success Trust "has brokered a deal with
four major banking institutions and over 180 financial outlets to tap into the equity
of an owner's property" and that "banks have contracted with Success Trust &
Holding LLC for 400 months! Let me REPEAT that... the banks have
CONTRACTED for 33 years!"

59.     Reynolds and Success Trust falsely represent that investors in the
Real Estate Program will receive bank guarantees or other instruments to protect

17

their real property. For example, the Website stated, falsely, that Success Trust will provide "you, the client, with a 100% bank guarantee letter," and that the guarantee would provide assurance that the "bank or STH [Success Trust] will not take my house."

60.     Similarly, a Success Trust presentation given in 2005 stated that Success Trust would "cover the contract with a Performance Bond (insurance) to give you 'peace of mind' that you won't lose your property!" and that Success Trust would "issue a shareholder certificate of beneficial interest" and "certificate of membership into the Trust." These claims were false and misleading.

61.     Reynolds and Success Trust also have made numerous misrepresentations intended to deceive investors and potential investors into believing that the Programs have regulatory approval. For example, in a letter distributed in June 2006 to investors and Independent Representatives, Reynolds falsely stated that Success Trust's transactions entail a "complete compliance checklist to be out of harm's way from any state or any government authority including SEC" and that "the programs that I'm looking at are all federally registered and do have their number attached to them."

18

62.    Similarly, versions of Client Agreements used by Success Trust with some investors expressly stated: "It is understood that all platforms used for the completion of this banking process are currently federally endorsed." This claim was false.

63.    Reynolds and Success Trust also failed to disclose that the company used at least some investor funds to pay $78,000 or more in commissions to Independent Representatives from May 2005 through June 2006.

64.    Defendants also failed to tell investors that the funds from all three Programs would be commingled in Success Trust's bank account, and that funds from this account would be used to pay various personal expenses of Reynolds.

65.    The investments offered and sold by the defendants are securities. Investors in the Programs have no role whatsoever in the management of the Programs. No registration statement has been filed with the Commission in connection with any of the offerings.

## COUNT I—UNREGISTERED OFFERING OF SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. § 77e(a) and 77e(c)]

66.    Paragraphs 1 through 65 are hereby realleged and are incorporated herein by reference.

67.    No registration statement has been filed or is in effect with the Commission pursuant to the Securities Act and no exemption from registration exists with respect to the transactions described herein.

68.    From as early as May 2005, defendants Reynolds and Success Trust, singly and in concert, have:

(a)    made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell the securities described herein, through the use or medium of a prospectus or otherwise;

(b)    carried securities or caused such securities, as described herein, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or for delivery after sale; and

20

(c) made use of the means or instruments of transportation or

communication in interstate commerce or of the mails to offer to sell or

offer to buy the securities described herein, through the use or medium

of any prospectus or otherwise,

without a registration statement having been filed with the Commission as to such

securities.

69.    By reason of the foregoing, the defendants, directly and indirectly,

singly and in concert, have violated and, unless enjoined, will continue to violate

Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II—FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

70.    Paragraphs 1 through 65 are hereby realleged and are incorporated

herein by reference.

71.    From as early as May 2005, defendants Reynolds and Success Trust,

in the offer and sale of the securities described herein, by the use of means and

instruments of transportation and communication in interstate commerce and by use

21

of the mails, directly and indirectly, employed devices, schemes and artifices to

defraud purchasers of such securities, all as more particularly described above.

72.    The defendants knowingly, intentionally, and/or recklessly engaged in

the aforementioned devices, schemes and artifices to defraud.

73.    While engaging in the course of conduct described above, the

defendants acted with scienter, that is, with an intent to deceive, manipulate or

defraud or with a severe reckless disregard for the truth.

74.    By reason of the foregoing, the defendants, directly and indirectly,

have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the

Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III—FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

75.    Paragraphs 1 through 65 are hereby realleged and are incorporated

herein by reference.

76.    From as early as May 2005, defendants Reynolds and Success Trust,

in the offer and sale of the securities described herein, by use of means and

22

instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

      a.      obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      b.      engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

      all as more particularly described above.

      77.      By reason of the foregoing, the defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

23

## COUNT IV—FRAUD

## Violations of Section 10(b) of the Exchange Act
## [15 U.S.C. § 78j(b)]and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

78.    Paragraphs 1 through 65 are hereby realleged and are incorporated herein by reference.

79.    From as early as May 2005, defendants Reynolds and Success Trust, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

        a.    employed devices, schemes, and artifices to defraud;

        b.    made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

        c.    engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

    all as more particularly described above.

24

80.    The defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, the defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

81.    By reason of the foregoing, the defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission respectfully prays for:

### I.

Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that the defendants named in this complaint committed the violations alleged in this complaint.

25

## II.

A temporary restraining order, preliminary and permanent injunctions

enjoining the defendants, their officers, agents, servants, employees, and attorneys,

and those persons in active concert or participation with them who receive actual

notice of the order of injunction, by personal service or otherwise, and each of

them, from violating, directly or indirectly, Sections 5(a), 5(c) and 17(a) of the

Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

promulgated thereunder.

## III.

An order: requiring an accounting of the use of proceeds of the sales of the

securities described in this complaint; requiring the disgorgement by the defendants

of all ill-gotten gains or unjust enrichment with prejudgment interest to effect the

remedial purposes of the federal securities laws; expediting discovery; freezing the

assets and preserving the documents of the defendants, to preserve the status quo;

and requiring the defendants to repatriate to a U.S. bank account designated by the

Court any investor funds transferred to offshore sites.

26

## IV.

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]

and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] imposing civil

penalties against the defendants.

## V.

Such other and further relief as this Court may deem just, equitable, and

appropriate in connection with the enforcement of the federal securities laws and for

the protection of investors.

Dated this 2nd day of August, 2006.

Respectfully submitted,

William P. Hicks
District Trial Counsel
Georgia Bar No. 351649
E-mail: hicksw@sec.gov

Alana R. Black
Senior Trial Counsel
Georgia Bar No. 785045
E-mail: blacka@sec.gov

27

FILED IN CHAMBERS
U.S.D.C.   Atlanta

JUL 23 2007

JAMES N. HATTEN, Clerk
By. _____ Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : Civil Action No.<br>: 01:06-cv-1801-RWS |
| ARCHIE PAUL REYNOLDS a/k/a DR. A. PAUL REYNOLDS, and SUCCESS TRUST DEVELOPMENT PARTNERS LLC, | : |
| Defendants. | : |

## ORDER APPOINTING A RECEIVER

The Plaintiff Securities and Exchange Commission ("Commission") having

filed a Complaint and Defendants Success Trust and Holding LLC ("Success Trust")

and Archie Paul Reynolds a/k/a Paul Archie Reynolds ("Reynolds") (collectively

"Defendants") having entered general appearances; consented to the Court's

jurisdiction over Defendants and the subject matter of this action; consented to

entry of this Order Appointing a Receiver ("Order Appointing a Receiver")

without admitting or denying the allegations of the Complaint (except as to

jurisdiction); waived findings of fact and conclusions of law with respect to this

Order; and waived any right to appeal from this Consent Order:



EXHIBIT
B

**I.**

**IT IS HEREBY ORDERED** that a Receiver is both necessary and

appropriate in order to protect personal information of investors in the hands of

Defendants, seek recovery of investor funds which may have been dissipated by

Defendants by asserting claims against third parties, provide an accounting of investor

funds, and for other purposes. This Court hereby takes exclusive jurisdiction and

possession of the assets, monies, securities, properties, real and personal, tangible

and intangible, of whatever kind and description, wherever situated, of Defendant

Success Trust, or that are attributable to funds provided by an investor or client of the

Defendants, including but not limited to all funds in bank accounts maintained in the

names of Success Trust and Holding, LLC; Success Holdings LLC, and Giving

Hands, LLC.

**II.**

**IT IS FURTHER ORDERED** that Pat Huddleston II, of the Huddleston

Law Firm, 707 Whitlock Avenue, S.W., Suite B-21, Marietta GA 30064, is

appointed Receiver for Defendant Success Trust, without bond.  Defendant

Success Trust and its assets are collectively referred to herein as "the Receiver

Estate." No person holding or claiming any position of any sort with the Receiver

Estate shall possess any authority to act by or on behalf of any of the Receiver Estate,

2

except as authorized by the Receiver. All persons, including but not limited to the
Defendants and their officers, agents, servants, employees, attorneys, and all
persons in active concert or participation with them, who receive actual notice of
this *Order* by personal service or otherwise, are enjoined from in any way
interfering with the operation of the Receivership or in any way disturbing the
assets of Receivership Estate and from filing or prosecuting any actions or
proceedings which involve the Receiver or which affect the Receivership Estate,
specifically including any proceeding initiated pursuant to the United States
Bankruptcy Code, except with the prior permission of this Court.

### III.

**IT IS FURTHER ORDERED** that The Receiver shall have and possess all
powers and rights to administer and manage the Receiver Estate, including, but not
limited to the power and authority to:

(a)    to take custody, control and possession of all records, assets,
funds, property premises and other materials of any kind in the possession of
or under the direct or indirect control of the Receiver Estate and, until
further order of this Court;

(b)    to manage, control, operate and maintain the Receiver Estate, to
use income, earnings, rents and profits of the Receiver Estate, with full

3

power to sue for, collect, recover, receive and take into possession all goods,
chattels, rights, credits, monies, effects, lands, books and records of accounts
and other documents, data and materials;

(c)    to conduct the business operations of Defendants named in the
first paragraph of this *Order*, above, and the entities they control, including
the collection of rents or continuation and termination or any employment
arrangement and all other aspects of any active business operation;

(d)    to make such ordinary and necessary payments, distributions,
and disbursements as he deems advisable or proper for the marshaling,
maintenance or preservation of the Receivership Estate;

(e)    to sell, rent, lease or otherwise hypothecate or dispose of the
assets of the Receiver Estate;

(f)    to contact and negotiate with any creditors of the Defendant
Success Trust for the purpose of compromising or settling any claim,
including the surrender of assets to secured creditors;

(g)    to receive and collect any and all sums of money due or owing
to Defendant Success Trust whether the same are now due or shall hereafter
become due and payable, and is authorized to incur such expenses and make
such disbursements as are necessary and proper for the collection,

4

preservation, maintenance, administration and operation of the Receiver

Estate;

(h)     to renew, cancel, terminate, or otherwise adjust any pending

lease agreements to which Defendant Success Trust is a party;

(i)     to institute, defend, compromise or adjust such actions or

proceedings in state or federal courts now pending and hereafter instituted,

as may in his discretion be advisable or proper for the protection and

administration of the Receivership Estate;

(j)     to institute such actions or proceedings to impose a constructive

trust, obtain possession and/or recover judgment with respect to persons or

entities who received assets or funds traceable to investor monies, with all

such actions filed in this Court;

(k)     to open bank accounts or other depository accounts, in the name

of the Receiver on behalf of the Receiver Estate;

(l)     to prepare any and all tax returns and related documents

regarding the assets and operation of the Receiver Estate;

(m)     to take any action which could be taken by the officers,

directors, managers, members, partners, trustees or other principals of the

Receiver Estate;

5

(n)   to abandon any asset that, in the exercise of his reasonable

business judgment, will not provide benefit or value to the Receiver Estate;

and,

(o)   to take such other action as may be approved by this Court.

### IV.

**IT IS FURTHER ORDERED** that the Receiver shall be empowered. but is

not required, to file a voluntary petition for relief under Title 11 of the United

States Code (the Bankruptcy Code) for the Receiver Estate or any portion thereof.

If a bankruptcy petition is filed, the Receiver shall become, and shall be

empowered to operate the Receiver Estate as a debtor in possession, with all

powers and duties provided to a debtor in possession under the Bankruptcy Code to

the exclusion of any other person or entity. Without leave or further order of this

Court, no person other than the Receiver is authorized to seek relief for any person

or entity included within the Receiver Estate

### V.

**IT IS FURTHER ORDERED** that With respect to the asset freeze set forth

herein, the Receiver shall be authorized, but not required, to administer, manage, and

direct the marshaling, disbursement and/or transfer of monies or other assets held by

third parties that are subject to the freeze. The Receiver may, in the reasonable

6

exercise of his discretion, authorize the release, use or segregation of proceeds held by third parties.

## VI.

**IT IS FURTHER ORDERED** that The Receiver shall perform an accounting of the offering and sale of securities that is outlined in the Commission's Complaint including, but not limited to, the Defendants' solicitation, receipt, disposition and use of the proceeds from such offering.

## VII.

**IT IS FURTHER ORDERED** that the Defendants and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, who receive actual notice of this *Order*, shall cooperate with the Receiver and the other professionals working with him in the administration of the Receiver Estate, including, but not limited to, the immediate delivery to the Receiver of the following:

(a)    all assets and other materials of the Receiver Estate in the possession or under their control, as well as the name and contact information of any person who has knowledge of the nature or location of assets or other materials belonging to the Receiver Estate;

(b)    business records of any kind, whether in hard copy or electronic

7

format, including e-mail files and accounts. customer files, accounting and financial records, bank records and brokerage or other depository records;

(c)    insurance policies regarding any assets or persons that are in any way affiliated with the Receiver Estate, along with other information regarding insurance coverage or the absence thereof;

(d)    computers and computer files, including e-mail files, along with all passwords for such files, that belong to or are under the control of Defendant Success Trust or that in any way relate to the assets or the operation of the Receiver Estate;

(e)    passwords and other identifying information regarding all computer or on-line files, banking or brokerage accounts and/or any other assets of any of Defendant Success Trust or under their direct or indirect control, specifically including but not limited to, passwords for internet or electronic access banking, brokerage and other on-line accounts;

(f)    keys, security cards, parking cards and other access codes for premises, vehicles, safety deposit boxes or accounts or assets under the direct or indirect control of Defendant Success Trust; and,

(g)    such other information related to the Receiver Estate as the Receiver and those working with him reasonably request.

8

## VIII.

**IT IS FURTHER ORDERED** that any bank, brokerage firm, mutual fund or other financial institution or any other person, partnership, corporation or other entity maintaining or having custody or control of: (a) any brokerage or depository accounts or other assets of the Receiver Estate; or, (b) accounts into which proceeds of the subject investment offering(s) have been deposited; or, (c) accounts or assets under the direct or indirect control of the Defendants, who receives actual notice of this *Order*, shall:

(a)    freeze such accounts, funds or assets;

(b)    within twenty-one (21) business days of receipt of such notice, file with the Court and serve on the Receiver and counsel for the Commission a certified statement setting forth, with respect to each such account or other assets, the balance in the account or the description of the assets as of the close of business on the date of the receipt of the notice;

(c)    promptly cooperate with the Receiver to determine whether and to what extent any accounts, funds or other assets are actually assets or proceeds of assets of the Receiver Estate;

(d)    provide to the Receiver records of such funds, accounts and assets and tender said funds and/or the assets to the Receiver.

9

To the extent that there are assets about which a determination of ownership
cannot be made, they shall be turned over to the Receiver to be held in escrow
pending a determination of the ownership of such assets.

The Receiver is authorized to provide notice of the entry of this *Order* to any
governmental agency. person or other entity he deems appropriate. Actual notice
may be accomplished by delivery of a copy of this *Order* by hand, U.S. mail,
courier service, facsimile, by e-mail or by any other reasonable means of delivery.

## IX.

**IT IS FURTHER ORDERED** that the Receiver is hereby authorized to
make appropriate notification to the United States Postal Service to forward
delivery of any mail addressed to Defendant Success Trust, above, or any company
or entity under the direction or control of Defendant Success Trust, to any Post
Office box or other mail depository, to himself. Further, the Receiver is hereby
authorized to open and inspect all such mail, to determine the location or identity
of assets or the existence and amount of claims.

## X.

**IT IS FURTHER ORDERED** that the Receiver may investigate any
matters he deems appropriate in connection with discovering additional

10

information as it relates to the activities of the Receiver Estate. In connection with
any such investigation. the Receiver is authorized to:

> (a)    compel, including by subpoena, the appearance and testimony
> of all persons, including the Defendants (prior to and/or after the filing of
> responsive pleadings in this action) and the production of the originals of
> any records and materials, of any sort whatsoever, within the possession,
> custody or control of any person, though the Receiver's authority under this
> paragraph shall not be construed to require the waiver by any person of any
> validly asserted privilege; and,

> (b)    order consumer and credit reports that the he deems necessary
> and appropriate as a part of his investigation.

## XI.

**IT IS FURTHER ORDERED** that The Receiver is hereby directed to file
with this Court and serve upon the parties, within 45 days after entry of this *Order*,
a preliminary report setting out the identity, location and value of the Receivership
Assets, and any liabilities pertaining thereto.

## XII.

**IT IS FURTHER ORDERED** that absent express permission and leave by
this Court, all creditors and other persons seeking money damages or other relief

11

from the Receiver Estate and all others acting on behalf of any such creditors and other persons, including sheriffs, marshals, and all officers and deputies, and their respective attorneys, servants, agents and employees, are, until further order of this Court, hereby stayed. Further, all persons having notice of this Order, including creditors and others seeking money damages or other relief from the Receiver Estate, and all others acting on behalf of any such creditors and other persons, including sheriffs, marshals, and all officers and deputies, and their respective attorneys, servants, agents and employees, are restrained from doing anything to interfere with the Receiver performance of his duties and the administration of the Receiver Estate. Accordingly, all such persons are enjoined from filing or prosecuting any actions or proceedings which involve the Receiver or which affect the Receivership Estate, specifically including any proceeding initiated pursuant to the United States Bankruptcy Code, except with the prior permission of this Court. Moreover, any such actions that are so authorized shall be filed in this Court.

## XIII.

**IT IS FURTHER ORDERED** that The Receiver is authorized to communicate with all such persons as he deems appropriate to inform them of the status of this matter and the financial condition of the Receiver Estate.

12

The Receiver is also hereby authorized to employ such employees, accountants,

consultants, attorneys and other professionals, including employees of his own

professional firm, as are necessary and proper for the administration of the

Receiver Estate and the performance of his duties as set forth herein.   The

Receiver shall seek and obtain the approval of this Court prior to disbursement of

professional fees and expenses to himself, his firm or his counsel, by presentation

of a written application therefore, and after consultation with the Commission.  All

costs incurred by the Receiver shall be paid from the Receivership Estate.  Upon

notice to all parties in this case, the Receiver may submit a proposed order

regarding an administrative process for the approval and payment of professional

fees and expenses consistent with this provision.

### XIV.

**IT IS FURTHER ORDERED** that Upon the request of the Receiver, the

United States Marshal's Office, in any judicial district, is hereby ordered to assist

the Receiver in carrying out his duties to take possession, custody or control of, or

identify the location of, any assets, records or other materials belonging to the

Receivership Estate.

### XV.

13

**IT IS FURTHER ORDERED** that the Receiver is authorized to remove any person from any premises or real estate that is owned or controlled by or that is otherwise part of the Receiver Estate. The Receiver shall keep the Commission and the Court apprised at reasonable intervals of developments concerning the operation of the receivership, and shall provide to the Commission upon request any documents under the control of the Receiver.

## XVI.

**IT IS FURTHER ORDERED** that the Receiver shall promptly notify the Court and counsel for the Commission of any failure or apparent failure of any Defendant or Relief Defendant to comply in any way with the terms of this Order.

## XVII.

**IT IS FURTHER ORDERED** that except for an act of gross negligence or intentional misconduct, the Receiver and all persons engaged or employed by him shall not be liable for any loss or damage incurred by any person or entity by reason of any act performed or omitted to be performed by the Receiver or those engaged or employed by him in connection with the discharge of their duties and responsibilities in connection with the receivership.

14

## XVIII.

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this action for all purposes. The Receiver is hereby authorized, empowered and directed to apply to this Court, with notice to the Commission and Defendants, named in the first paragraph of this *Order*, above, for issuance of such other orders as may be necessary and appropriate in order to carry out the mandate of this Court.

## XIX.

**IT IS FURTHER ORDERED** that this *Order* will remain in effect until modified by further order of this Court.

## XX.

**IT IS FURTHER ORDERED** that the Defendants' Consent is incorporated

herein with the same force and effect as if fully set forth herein, and that

Defendants shall comply with all of the undertakings and agreements set forth

therein.

## XXI.

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this

matter for all purposes.

Dated: _July 23_, 2007

_____
UNITED STATES DISTRICT JUDGE

16